# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MAJOR GENERAL PAUL FLETCHER and KATHY FLETCHER, | ) ) ) |
| Plaintiffs, | ) ) |
| Vs. | ) CV-08-JEO-01844 ) ) |
| DAMION LUPO; DAN PENA; ROBERT PARK WILSON; BRUCE WHIPPLE; MICHAEL PIERCE; DENALI INVESTMENT GROUP, INC.; and DPG WATTS, LLC. | ) ) ) ) ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

### PARTIES

1.   Plaintiff Major General Paul Fletcher is a resident of Washington State.

2.   Plaintiff Kathy Fletcher is a resident of Washington State.

3.   Defendant Damion Lupo (hereinafter "Lupo") is a real estate investor who conducts and or conducted business in Alabama.  Lupo served as President of Denali Investment Group, Inc., as a managing member of DPG Watts, LLC and Associate Principal of The Guthrie Group.

4.   Defendant Dan Peña (hereinafter "Peña") is a real estate investor who conducts or conducted business in Alabama.  During the time at issue, Pena acted as a Director of co-defendant Denali Investment Group, Inc., and a "Principal" of co-defendant DPG Watts, LLC.  Under the Alabama Securities Act, Pena can be held personally liable for fraud committed by those entities.

5. Defendant Robert Park Wilson (hereinafter "Wilson") is a real estate investor who conducts or conducted business in Alabama. Wilson served as Secretary of co-defendant Denali Investment Group, Inc. and as a managing member of co-defendant DPG Watts, LLC. Under the Alabama Securities Act, Wilson can be held personally liable for fraud committed by those entities.

6. Defendant Bruce Whipple (hereinafter "Whipple") is a real estate investor who conducts or conducted business in Alabama and who acted as a principal of co-defendant DPG Watts, LLC. Under the Alabama Securities Act, Whipple can be held personally liable for fraud committed by that entity.

7. Defendant Michael Pierce (hereinafter "Pierce") is a real estate investor who conducts or conducted business in Alabama and who acted as a principal of co-defendant DPG Watts, LLC. Under the Alabama Securities Act, Pierce can be held personally liable for fraud committed by that entity.

8. Defendant Denali Investment Group, Inc. (hereinafter "Denali") is or was an Arizona Corporation that conducts or conducted business in Alabama. As noted, supra, several codefendants served as principals or agents of that entity.

9. Defendant DPG Watts, LLC (hereinafter "DPG Watts") is an Alabama corporation that conducts or conducted business in Alabama. As noted, supra, several codefendants served as principals or agents of that entity.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action because it involves a controversy in excess of $75,000 and there is complete diversity of citizenship among the parties. Venue is proper in this Court because the acts complained of occurred

here and the property that is the subject of this lawsuit is located in this District. Additionally, at least one Defendant resides in this County. The Court can assert personal jurisdiction over each and every defendant without offending notions of due process.

## BACKGROUND FACTS

11. Major General Paul Fletcher (U.S. Air Force, retired), and his wife, Kathy first met Lupo, President of Denali Investment Group, Inc. and Managing Member of DPG Watts, LLC at a fly-in resort while on vacation in Alaska in April of 2002. The Fletchers signed the paperwork on their first real estate deal with Mr. Lupo in April of 2003, investing $70,000 and earning 17% interest on their investment.

12. In late February or early March of 2006, Mr. Lupo contacted the Fletchers about investing in the redevelopment of 20 condominiums in the Watts Tower Building (the "Project") in Birmingham, Alabama, through a newly formed entity called "DPG Watts, LLC" ("DPG Watts"). Soliciting a commitment from the Fletchers, Mr. Lupo represented that the total investment from all investors would total $800,000. Mr. Lupo told the Fletchers to expect a 20% to 30% return on their investment from DPG Watts, and that the project would include acquisition financing of approximately $1.0 to $1.2 million from a local Birmingham lender.

13. One of Lupo's business associates was Peña, the self-styled $400 Million Man who resides at the historic Guthrie Castle in Scotland and conducts real estate investment seminars. Mr. Peña is also Director of Denali Investment Group, Inc. Another one of Lupo's associates was Wilson, Secretary of Denali Investment Group, Inc. and Managing Member of DPG Watts, LLC.

14. On March 6, 2006, Lupo emailed the Fletchers a FAQ detailing the terms of the project, revealing Peña, Whipple and Pierce's participation in the project, setting forth the requirement of the principals to invest $200,000 in the project, and providing that Denali would maintain a $500,000 cash reserve for contingencies which would be available to DPG Watts. Further, the FAQ also set forth the project was to be completed in ten months, and that the contractor on the project, Richardson Construction Company, had been given a "Maximum Cost Bid." However, the FAQ did not designate which Denali entity would maintain this reserve, as Lupo owned several entities which included the name Denali.

15. Later in March of 2006, Lupo emailed the Fletchers a copy of the DPG Watts Operating Agreement, which set forth the required $200,000 initial contribution, provided that Denali Investment Group, Inc. would receive a one-time developer fee of $50,000 and an additional fee of $3,000 per month until the liquidation of all the condominiums, and also provided the schedule for a graduated incentive profit distribution scale for Lupo to sell condominiums at a maximum price. The schedule also confirmed Lupo's obligation to contribute the necessary $200,000 in cash.

16. On March 14, 2006, the Fletchers signed Subscription Agreements for the DPG Watts investment, which referenced a Confidential Private Placement Memorandum, which they never received.

17. On March 16, 2006, Mr. Lupo sent wiring instructions to the Fletchers and shortly thereafter the Fletchers wired Lupo their $300,000 investment in DPG Watts.

18. In mid-March, Peña made a trip to Birmingham to have a meeting with Lupo, Wilson and Union State Bank officers to secure the Project's $1,500,000.00

4

financing. Without Pena's personal participation, financing for the project could not have occurred. During this meeting, Union State Bank requested that DPG Watts maintain a $500,000 interest reserve to service the bank loan. Lupo represented to the bank that the reserve would be maintained, but the initial deposit was actually the investors' capital, which was systematically withdrawn from the account and used to pay ongoing expenses.

19. Eight to nine of the original twenty condominium units were sold pre-construction, prior to the failing/depressed real estate market. Despite the FAQ conveying that the contractor's fees were fixed, one additional unit was used by Lupo in the settlement of a claim with the general contractor resulting from change-orders and over-runs.

20. Thereafter, the units quit selling and Lupo never lowered the MLS list prices despite comparable units in Watts Tower selling for $10,000-$50,000 less than Lupo's MLS prices. Lupo refused to lower the prices to preserve his potential profit distribution per the Operating Agreement provided to the Fletchers.

21. On or around April of 2007, the Union State Bank debt matured. Lupo and Wilson, along with an investor named Wolfe re-executed personal guarantees and provided financial statements to the Bank to obtain a six month extension on the debt. Unknown to the Fletchers, Lupo promised to pay Wolfe $35,000 from company funds when the extension had been secured.

22. In May of 2007, Wilson, a managing member of DPG Watts, abandoned management duties in pursuit of other business opportunities and Lupo took over day-to-day management of DPG Watts. When the Fletchers met with Lupo in October of 2007, he failed to mention this despite the purpose of the meeting being to deliver bad news on

another investment face to face, and related that the DPG Watts was "good" and there was no need to drop prices. It was not until January of 2008 that the Fletchers learned Wilson had departed and Lupo had taken over the day-to-day management.

23. Lupo used several different email signatures including "Damion Lupo, CCIM, Associate Principal of The Guthrie Group," and "Damion Lupo, President and CEO of Denali Investment Group, Inc."

24. In the summer of 2007, Lupo arranged for distasteful/suggestive marking promotions which garnered negative attention from the media and the Watts Tower HOA, and were quickly taken down.

25. On January 31, 2008, the 6 month extension of bank debt matured with a principal balance of $561,927. At this time, Wilson refused to provide financials to the bank and to cooperate with Lupo to obtain another extension on the debt. According to Lupo, Wilson owed Lupo in excess of $400,000 for side deals and Wilson proposed to pay Lupo $50,000 in exchange for a release and waiver covering Wilson's activities during the past 5 years, including Wilson's management of DPG Watts.

26. According to Lupo, they never reached a deal, and on January 31, he had a teleconference meeting with the DPG Watts investors to inform them of the maturation of the bank debt and to vote to expel Wilson from DPG Watts. Lupo claimed Wilson was a fiduciary and had to be held to the highest standards. The members unanimously voted to expel Wilson from DPG Watts. DID PENA ATTEND?

27. Shortly thereafter, in March 2008, the Fletchers contacted Johnston Barton Proctor and Rose (hereinafter "Johnston Barton") to seek advice on how to protect their investment and prevent foreclosure on the project through means other than litigation, as

they did not believe that litigation would provide a timely in light of the default. Around that time, the Fletchers also learned that Lupo did not invest $200,000 in the project as he had earlier represented in the FAQ and Operating Agreement. Lupo denied repeated requests to see copies of the DPG Watts financial statements.

28.  Lupo paid himself over $120,000 throughout this deal – a $50,000 development fee and $3,000 a month for over two years.

29.   Lupo told the Fletchers that the market price per unit was approximately $165,000 even though the Fletchers had information that comparable units in the Watts Tower sold for approximately $125,000 - $150,000 and pre-sold units all sold at even higher prices. By not lowering the prices, Lupo failed to serve the investors' best interests.

30.  On March 11, 2008, Union State Bank mailed a letter to DPG Watts and other guarantors setting a date of March 21, 2008 for a complete payoff of the debt.

31.  Around March 12, 2008 during a conversation with Lupo, Mrs. Fletcher told Lupo that he needed to contribute his $200,000 to help pay down the bank debt and hold off foreclosure. Lupo acknowledged he had not contributed his $200,000 and that he would not hold up this end of the bargain, claiming it would be foolish to put his money in the project at that point, and that he "was not a bank."

32.  Around March 12, 2008, General Fletcher emailed Lupo informing him of his duty to contribute $200,000 and questioning whether he was acting on behalf of the other members. Fletcher also questioned Lupo's unwillingness to lower the price of the units to protect his potential profits, despite keeping the $3,000 per month fee. Lupo

7

responded that his $200,000 was insignificant to the bank, and that if he dropped prices, the other owners would sue him for "trashing their values."

33. Ultimately, Lupo offered the Fletchers two options: (1) significantly buy down the debt by taking a personal loan and contributing the loan proceeds to DPG Watts, or (2) suffer foreclosure and lose all their equity in DPG Watts.

34. The Fletchers offered to give consideration to Lupo on the condition that he would forward to them signed copies of the Operating Agreement and the contact information for all of the other members. Lupo never provided this information.

35. General Fletcher again requested the identities of the other investors and demanded that he would need to have shared management authority over DPG Watts as consideration for his anticipated increased investment. Lupo refused, and told Mr. Fletcher that the longer Fletcher stalled, the more the Fletchers' capital would be lost. In response to this, the Fletchers asked Johnston Barton to send Lupo a formal demand to inspect the DPG Watts books and records. Lupo ignored this request.

36. On March 19, 2008, Mr. Wolfe, an investor and co-guarantor sent an email to Lupo requesting the return of his monies invested in DPG Watts, and urging Lupo to lower prices of the units. Mr. Wolfe also expressed that refusing to lower prices did not affect Lupo's investment, only his potential profit, and it was actually Mr. Wolfe's, the Fletchers' and the other investors monies' at stake.

37. On March 20, 2008, Lupo refused to relinquish management control, but rather agreed to let the Fletchers purchase five units outright from DPG to manage on their own. The Fletchers entertained this plan and the idea of paying Lupo (upon their eventual sale of their newly purchased condominiums) an amount equal to what Lupo

would've received under the Operating Agreement waterfall. Lupo insisted that such future payments be fixed amounts, thereby making the waterfall payments absolute obligations without regard to the ultimate selling price per unit. At that point, the Fletchers requested that Johnston Barton cease its review of the present matter.

38. On March 24, 2008, the Fletchers informed Johnston Barton that they reached a tentative deal with Lupo to satisfy the bank debt, which would involve them receiving clear title to five condominiums and paying $190,000 in cash to DPG Watts. The Fletchers would then be credited for (i) their initial $300,000 investment and (ii) $110,000, which was a debt owed by Denali Investment Group, Inc. to the Fletchers. Denali would be obligated to pay this amount to DPG Watts on behalf of the Fletchers.

39. On April 30, 2008, Lupo sent an email to the Fletchers stating that he made a $2,000 personal deposit into DPG Watts.

40. On May 1, 2008, Lupo sent an email to all DPG Watts members detailing the proposed plan with the Fletchers.

41. On May 15, 2008, Lupo told the Fletchers he obtained most of the other members' consents to the redemption, but that the last few signatures did not matter.

42. On May 16, 2008, Lupo email Mrs. Fletcher that he had obtained all the members' signatures.

43. In early July of 2008, Lupo asked the Fletchers to prepare three of the deeds in connection with the sale/redemption. Lupo agreed to reimburse the Fletchers for the cost of Johnston Barton's deed preparation ($735.00). Subsequently, Lupo changed his mind about paying this amount, deeming it excessive and stopped payment on the check.

44.     On July 22, 2008, Charles Valekis, the Fletchers' realtor, emailed Johnston Barton to inform them that, in his opinion, the Fletchers' condos should be priced between $129,000-$139,000 (much lower than the $168,900-$178,900 range Lupo maintained and used as a basis for selling to the Fletchers).  Also, professional appraisals supported the lower end pricing for the majority of the units based on price per square foot, suggesting prices between $119,900 and $144,900.

45.     On or about July 23, 2008, the Fletchers received a Wells Fargo appraisal for Unit 6(D), which reflected 866 square feet at a price of $202 per square foot.  The Fletchers' appraisal stated that the most similar comp in size and location sold in January 2008 for $155,000 at $145 per square foot.  The Fletchers emailed Lupo to ask if the prices should be adjusted to reflect market sales.

46.     Lupo, prior to the redemption/sale represented to them that the units were "at around 1000 square feet."  Mr. Lupo denied this and argued that square footage was irrelevant since the condo units were split based on MLS price.  Mr. Lupo stated that he would not change the mortgages based on this information.

47.     The Fletchers relied on the contention that the mortgages were premised on a selling price of near $165,000 each and the 1,000 square foot representation.

48.     On July 28, 2008, the Fletchers continued to tell Lupo that the basis amounts of the mortgages were based on two criteria: (1) that all condo units were nearly the same size at 1,000 square feet and (2) that if the units were worth $165 per square foot, the original price list contained square footages that were incorrect.

**OVERVIEW OF DEFENDANTS' LIABILITY**

**Lupo's Wrongful Conduct**:

10

49. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

50. Lupo is liable pursuant to Alabama's Securities Act for the following acts or omissions: (1) failure to contribute $200,000 in capital to the venture; (2) did not provide a return of 30% on the principal; (3) acting as an unregistered agent/advisor; and (4) failure to disclose prior real estate disciplinary proceeding in Arizona.

51. Lupo breached his management duties he owed to Denali by: failure to allow inspection of records; (2) offering to pay debts to third parties from company's proceeds; (3) paying unauthorized and ultra vires expenses from company funds; and (v) violating the Alabama Condominium Act.

52. In addition to the foregoing, Pena committed other acts that were fraudulent, constitute conversion of company funds, and were breaches of contract.

**Co-Defendants' Liability for Lupo's Conduct**

53. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

54. Alabama Code Section 8-6-2 (10) defines security as:

> *Security*. Any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease, annuity contract unless issued by an insurance company, bankers' shares, trustees' shares, investment participating bonds, investment trust debentures, units, shares, bonds and certificates in, for, respecting, or based upon any form of securities or collateral, subscriptions and contracts covering or pertaining to the sale or purchase on the installment plan of any security as herein defined, or subscription or contracts covering or pertaining to the sale or purchase of beneficial interest in title to property, profits or earnings, or any right to

11

subscribe to any of the foregoing, or any instrument of any kind commonly known as a security.

55. Section 8-6-19(a) of the Alabama Code imposes liability for securities fraud on any person who:

   (1) sells or offers to sell a security in violation of any provision of the Alabama Securities Act; **or**

   (2) sells or offers to sell a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omissions, and who does not sustain the burden of proof that he (*i.e.*, the defendant) did not know and in the exercise of reasonable care could not have known of the untruth or omission.

56. Section 8-6-17(a) makes it unlawful for any person, in connection with the offer, sale, or purchase of a security, to:

   (1) employ a device, scheme, or artifice to defraud;

   (2) make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; **or**

   (3) engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon any person.

57. Section 8-6-19(c) of the Act, states:

(c) Every person who directly or indirectly controls a person liable under subsections (a) or (b) of this section, including **every partner, officer, or director of such a person**, every person occupying a similar status or performing similar functions, **every employee of such a person who materially aids in the conduct giving rise to the liability, and every dealer or agent who materially aids in such conduct is also liable jointly and severally with and to the same extent as the person liable**

**under subsection (a) or (b),** unless he is able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

58. This foregoing section attributes Lupo's wrongful conduct to Pena and the other directors, officers and agents of DPG Watts, LLC and Denali Investment Group, Inc. Pena was a director of Denali Investment Group, Inc., a principal of DPG Watts, LLC, and was acting as a partner/agent of Lupo when he journeyed from Scotland to Union State Bank to lobby for the loan approval A March 24, 2006 email from Lupo to Kathy Fletcher telling her that all the principals of the deal, including the "Chairman", was flying to Birmingham to talk to Union State Bank to beat them up on rates so more profit could be made). Lupo's wrongful and fraudulent conduct includes but is not limited to failure to provide a $500,000 contingency reserve, mischaracterization of the construction contract, failure of Lupo and the principals to contribute their investment.

59. Indeed, this same section of the Securities Act also holds the other individual defendants liable for Lupo's misconduct. Wilson served as Secretary of co-defendant Denali Investment Group, Inc. and as a managing member of co-defendant DPG Watts, LLC. Whipple acted as a principal of co-defendant DPG Watts, LLC. Under the Alabama Securities Act, Whipple can be held personally liable for fraud committed by that entity. Pierce acted as a principal of co-defendant DPG Watts, LLC. Under the Alabama Securities Act, Pierce can be held personally liable for fraud committed by that entity.

60. In addition, all of the defendants can be held liable for a civil conspiracy because of the underlying wrongs outlined herein.

## COUNT ONE:
## BREACH OF FIDUCIARY DUTY
### Against Defendant Lupo

61. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

62. By reason of the fact that Defendant acted as Plaintiffs broker, Defendants owed a fiduciary duty to the Plaintiffs to act in the utmost good faith in dealing with Plaintiffs, including, but not limited to, the following:

   a. The duty to recommend an investment only after studying it sufficiently to become informed as to its nature, price and financial volatility;

   b. The duty to inform the customer of the risks involved in purchasing or selling a particular security or insurance product;

   c. The duty to refrain from self dealing;

   d. The duty not to misrepresent or omit any fact material to a transaction; and

   e. The duty to act in the best interests of Plaintiffs.

63. Defendant breached each of the above duties.

64. As a result of Defendant's breaches, Plaintiffs have been damaged in an amount according to proof.

65. The aforementioned acts of Defendant Lupo was willful, wanton, malicious and oppressive and justify the awarding of exemplary and punitive damages against Defendant in an amount according to proof.

66. In addition, Plaintiffs seek all consequential damages proximately caused by Defendant's wrongful conduct, including, but not limited to lost opportunity costs, interest, adverse tax consequences, and professional and attorneys fees.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek damages against the defendant and any other relief to which they may be entitled.

### COUNT TWO:
### BREACH OF CONTRACT
### Against Defendants Lupo, Denali, and DPG Watts

67. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth fully herein.

68. Defendants breached obligations under their agreements with plaintiffs. Plaintiffs fulfilled all of their requirements. Because of Defendants' breaches Plaintiffs have been damaged.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek damages against the defendant and any other relief to which they may be entitled.

### COUNT THREE:
### COMMON LAW FRAUD
### Against Defendant Lupo

69. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

70. Lupo committed fraud by promising but failing to do the following: (1) failure to contribute $200,000 in capital; (2) failing to provide $500,000 in reserve; (3) failing to provide a 30% return on the investment. At the time Lupo made these representations he had no intent to actually perform.

71. Defendant Lupo further committed fraud by suppressing the following information from the Plaintiffs: (1) failing to disclose the Tennessee condo litigation pending at time of the agreement; and failing to disclose his prior disciplinary actions for real estate proceedings.

72. Plaintiffs relied to their detriment on Lupo's misstatements and omissions and have been damaged thereby. Plaintiffs' reliance was justified.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek damages against the defendant and any other relief to which they may be entitled.

### COUNT FOUR:
### FAILURE TO SUPERVISE AND CONTROL
### Against Defendants Denali, DPG Watts, and Pena

73. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

74. By reason of the fact that the Corporate Defendants, Denali and DPG Watts employed, controlled, supervised, licensed, and allowed Lupo to hold themselves out as agents that were registered and authorized to sell securities, they owed Plaintiffs a duty to properly supervise the individual broker Defendants, including but not limited to, the duty to control the representations Defendants made to Plaintiffs, to control Defendants' dealings with Plaintiffs, and to prevent Defendants from effectuating unsuitable transactions in Plaintiffs' accounts. In addition, as chairman, Pena had a duty to the Plaintiffs to also control the individual defendants.

75. Defendants breached their duties to Plaintiffs by failing to properly supervise the individual broker Defendants. Specifically, Defendants knew or should have known that the individual defendants were engaging in wrongful conduct as outlined herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek damages against the defendants and any other relief to which they may be entitled.

**COUNT FIVE:**
**VIOLATION OF STATE SECURITIES LAWS**
**Against Defendants Lupo, Pena, Wilson, Pierce, Denali, DPG Watts, and Whipple**

76. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

77. Defendants Lupo has violated Alabama Securities Act as set forth supra in paragraphs 50-52.

78. The other defendants are vicariously liable under the Securities Act for Lupo's conduct as set forth in paragraphs 54-59.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek damages against the defendants and any other relief to which they may be entitled.

**COUNT SIX:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Against all Defendants**

79. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

80. At all materials times, the Defendants had a duty to exercise reasonable care in all aspects of doing business.

81. These Defendants, jointly and/or severally, failed to exercise ordinary care in each area of their respective businesses and intentionally caused Plaintiffs emotional distress.

82. Defendants knew or should have known that investors such as Plaintiffs would suffer foreseeable injury as a result of the Defendants' failure to exercise ordinary care as described above.

83. As a legal and proximate result of the intentional acts of all Defendants which combined and concurred, Plaintiffs were caused to suffer severe emotional damages in an amount to be proven at trial.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek damages against the defendants and any other relief to which they may be entitled.

### COUNT SEVEN:
### CIVIL CONSPIRACY
### Against all Defendants

84. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

85. All defendants combined, conspired, agreed or acted in concert to commit the wrongful acts outlined herein including but not limited to the following underlying wrongs: (1) violation of Alabama Securities Act; (2) Lupo's fraudulent conduct described more fully herein; (3) Pena's role in securing financing for a failed project; and (4) breaches of fiduciary conduct.

86. Plaintiffs have been injured by all defendants acting in concert.

87. WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek damages against the defendants and any other relief to which they may be entitled.

### COUNT EIGHT:
### RESTITUTION/UNJUST ENRICHMENT
### Against Defendants Denali, DPG Watts, and Lupo

88. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

89. As set forth above, Defendants have been unjustly enriched to the detriment of Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek damages against the defendants and any other relief to which they may be entitled.

## COUNT NINE:
## ACCOUNTING
### Against Defendants Denali and DPG Watts

90. Plaintiffs hereby incorporate and allege each of the foregoing averments as if set forth herein.

91. In accordance with Alabama law, Plaintiffs have made proper demand to examine the books of the corporate defendants.  Plaintiffs have been denied their statutory right.

92. Plaintiffs hereby request that the Court order a proper accounting for them and other investors in the corporate defendants.


Respectfully submitted,


s/ Richard S. Frankowski
Richard S. Frankowski (ASB-1734-h70f)



**OF COUNSEL:**

**BURKE, HARVEY & FRANKOWSKI, LLC**
One Highland Place
2151 Highland Avenue
Suite 120
Birmingham, AL 35205
Tel:  205-930-9091
Fax:  205-930-9091
rfrankowski@bhflegal.com

## JURY DEMAND

Plaintiff demands a trial by struck jury.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon all counsel of record and the Court, using the Court's PACER CM/ECF electronic filing system, and/or first class and postage prepaid US mail, this the 16th day of December, 2008, as follows:

Damion Lupo
P.O. Box 12277
Scottsdale, AZ 85267
*Pro se*

Steven F. Casey
J. Eric Getty
David A. Lester
Balch & Bingham, LLP
P.O. Box 306
Birmingham, AL 35201-0306
*Attorneys for Dan Pena*

                                                    s/ Richard S. Frankowski
                                                    *Attorney for Plaintiffs*